FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

2015 MAY 22 P 2:46

CLERK, US DISTRICT COURT

POLLY CHARETTE,

Plaintiff,

vs.

CIVIL ACTION NO.: 3:15-cv-644-J32JBT

ROBERT A. MCDONALD, in his capacity as Secretary of the DEPARTMENT OF VETERANS AFFAIRS,

Defendant.

_________________________________/

**COMPLAINT FOR RELIEF AND DEMAND FOR JURY TRIAL**

COMES NOW Plaintiff, POLLY CHARETTE ("CHARETTE"), by and through the undersigned counsel, and hereby sues Defendant ROBERT A. MCDONALD, in his capacity as the Secretary of the Department of Veterans Affairs ("V.A."), and in support thereof states the following:

## NATURE OF THE ACTION

1. This is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e to correct the V.A.'s unlawful employment practices and to make Charette whole.

## JURISDICTION AND VENUE

2. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, and 1343.

3. The employment practices hereafter alleged to be unlawful took place in Jacksonville,

Duval County, Florida.

4. Plaintiff is a "person," as that term is defined by Title VII of the Civil Rights Act of 1964, 42 USCS § 2000e

5. At all times material to this complaint, Plaintiff resided in Jacksonville, Duval County, Florida.

6. The V.A. is an employer subject to Title VII of the Civil Rights Act of 1964 as described by 42 USCS § 2000e-16.

7. Defendant Robert A. McDonald is the Secretary for the V.A., and jurisdiction over Defendant is therefore properly invoked pursuant to 42 USCS § 2000e-16.

8. Plaintiff timely filed a charge of discrimination with the appropriate Agency Equal Employment Opportunity Counselor, and has complied with the procedural requisites for a federal employee.

9. Plaintiff further filed timely charges of reprisal/retaliation and has complied with the procedural requisites for a federal employee in order to bring such claims in this action.

10. Each of the allegations in this complaint were alleged and investigated through the EEO process or addressed through administrative discovery, and the Agency has been given adequate notice to permit it to investigate the allegations.

11. Pursuant to 42 USCS § 2000e-16, an employee, after one hundred and eighty days from the filing of the initial charge with the department, may file a civil action as provided in section 706 [42 USCS § 2000e-5], in which civil action the head of the department, agency, or unit, as appropriate, shall be the defendant.

12. More than 180 days have expired since the filing of the initial charge of

discrimination.

13. Plaintiff has therefore satisfied the procedural requirements for pursuing a claim in this Court and jurisdiction is therefore proper.

**STATEMENT OF FACTS**

14. Charette is a Senior Licensed Clinical Social Worker ("LCSW"), GS-12, Step 5, and has been employed by the V.A. since April 2008.

15. Charette transferred from a position in the Atlanta office of the V.A. in July 2011, and began working in the Jacksonville office of the V.A. The Jacksonville V.A. office is governed by the Gainesville Regional Office of the Veteran's Administration.

16. Upon beginning her position in Jacksonville, Charette was placed under the supervision of Ebony Benjamin ("Benjamin"), a licensed clinical social worker in the Mental Health Intensive Case Management ("MHICM") Program, who serves as the Jacksonville program coordinator.

17. Since Charette's transferring to Jacksonville in July 2011, the Jacksonville MHICM program has grown, adding at least four other employees.

18. Throughout the course of Charette's employment in Jacksonville, Benjamin expressed frustration when Charette shared concerns about her safety and well-being. Benjamin routinely trivialized Plaintiff's concerns and treated her harshly in comparison to Benjamin's other subordinates. Benjamin treated Charette in a demeaning fashion, belittling her concerns and subjecting her to ridicule among her co-workers.

19. Charette was troubled by Benjamin's mistreatment of her, and complained to Benjamin's supervisor, Kathleen Hulbert ("Hulbert"), but Charette had no specific reason to believe

that the mistreatment was based on Charette's race until the late fall of 2013.

20. Toby Hildinger ("Hildinger") was a co-worker of Charette, who also reported to Benjamin. In May 2013, Benjamin and Hildinger attended a qualified clinical supervisor training certification course, at which participants were asked to address cultural diversity and sensitivity issues. During the course, Benjamin used as an example of cultural insensitivity, Charette's raising of a question as to whether a specific inner-city basketball court was safe for a veteran's event.

21. Hildinger did not inform Charette that her supervisor had used Charette's question about the safety of the basketball court as an example of cultural insensitivity toward African-Americans, but later realized Benjamin's racial focus on Charette after Benjamin's explicit racial statements came to light.

22. On or about October 4, 2013, Benjamin summoned Charette's co-worker Anthony Watson ("Watson"), an African-American, to a meeting behind closed doors. Benjamin told Watson "don't go there" in reference to Charette, and advised him to "stay away" from her, and that "you don't want to be messing with that." She stated that Charette was "bad news" and a "stalker." Benjamin continued to state that Watson is "a very attractive man and a nice guy," and that she could understand why a "white woman would be attracted" to him.

23. During the October 4, 2013 closed door meeting with Watson, Benjamin suggested that administrative personnel had been gossiping about Watson and Charette. Further, Benjamin stated that she was a "sister looking out for a brother" and that "if any of this leaves this office, I don't got no love for you."

24. Benjamin, an African-American, apparently assumed that Watson would not disclose her racially motivated concerns with Charette. Watson, however, was very concerned that his

supervisor would make such racially discriminatory statements. Watson therefore soon afterwards advised Charette of Benjamin's statements and behavior.

25. On or about October 29, 2013, Benjamin called Watson into another closed-door meeting where she again suggested that Charette had acted in an inappropriately familiar fashion with Watson by violating his physical space at a community event two months earlier. Benjamin assured Watson that she was merely trying to "protect" him from Charette.

26. On October 30, 2013, Watson met privately with Benjamin and asked for more information about the discussion from the previous day, and Benjamin gave more details of the allegations, assuring Watson that the incident was not his fault and that Charette was at fault.

27. During his October 30, 2013 meeting with Benjamin, Watson told her that he was upset about her continued suggestions that he was engaged in an inappropriate relationship with Charette. Watson warned Benjamin that he would file an equal employment opportunity complaint if Benjamin's harassment did not cease. In response, Benjamin threatened to use Watson's mental health history to undermine his credibility if he were to complain.

28. On or about November 1, 2013, Benjamin called Watson into yet another closed-door meeting before Watson and Charette were scheduled to transport a veteran from Jacksonville to Gainesville. Benjamin instructed Watson to place the veteran in the front seat of the V.A. van so that he and Charette would be separated in the vehicle, and would not be seen sitting next to each other.

29. Charette filed an informal charge of discrimination following her learning of Benjamin's explicitly racial statements to Watson in October 2013, and her realization that Benjamin's continued adverse treatment of her was due to her race.

30. As part of the Equal Employment Opportunity ("EEO") process, Benjamin and her supervisor, Hulbert, were made aware of Charette's allegations of discrimination. Following Charette's informal complaint, Benjamin enhanced her adverse treatment of Charette.

31. Following Charette's informal complaint, Benjamin continued to dismiss Charette's safety concerns, and further ordered that Charette directly and solely interact with dangerous veterans without appropriate assistance or support from coworkers.

32. Following Charette's informal complaint, Benjamin assigned Charette a disproportionately large number of veterans who had demonstrated dangerous tendencies, and denied reasonable efforts and requests to ensure her safety during veteran interactions.

33. In June of 2014, Benjamin refused to relieve Charette of responsibility for providing clinical care to patient C.M., even though C. M. had made threats against Charette, including specific threats to her life.

34. In late April 2014, Benjamin withheld critical information from Charette regarding patient F.A.'s significant and abrupt change in his mental health status, resulting in his election to end his participation with the V.A. and the MHICM program. F.A. was highly delusional in his communications with Benjamin, and expressed repeated paranoid delusions regarding his history and interactions with V.A. staff. F.A. repeatedly and unmistakenly refused any further V.A. treatment. Instead of advising Charette of critical recent communications with a veteran who had a history of erratic and violent behavior, Benjamin knowingly permitted Charette to travel to the home of the veteran, and thereby consciously caused Charette to trespass on a psychologically unstable veteran's property.

35. Instead of documenting her critical interactions with F.A., Benjamin failed to update

F.A.'s electronic record to reflect her April 28, 2014 communications with F.A. until May 27, 2014. Benjamin additionally withheld from Charette the information regarding her April 28, 2014 communications with F.A. by purposefully electing to not add Charette as an "additional signer" on the electronic record, even though Charette had been assigned as the primary case manager for F.A. Benjamin later issued a corrective action notice to Charette on June 13, 2014, falsely accusing Charette of misrepresenting her interactions with the veteran.

36. On August 15, 2014, Charette specifically notified Hulbert that Benjamin had manipulated veteran F.A.'s treatment records and purposefully withheld critical information regarding F.A.'s sudden and abrupt decline of mental health status and rejection of V.A. services. Charette advised Hulbert that Benjamin had orchestrated Charette's visit to the home of an erratic and agitated veteran, contrary to the veteran's explicit directions, when the veteran was refusing V.A. contact because of delusions regarding V.A. staff. Charette specifically notified Hulbert that Benjamin's actions regarding F.A. reflected Benjamin's continuing retaliation for filing the complaint of discrimination, and provided documentation to support her concerns regarding Benjamin's actions involving veteran F.A.

37. Hulbert took no action to prevent further retaliation or danger, and ignored Charette's concerns.

38. In early May 2014, Benjamin removed Charette from participating in a previously approved qualified clinical supervisor certification training course, which would have assisted Charette in obtaining promotional and transfer opportunities within the V.A. Charette complained of Benjamin's discriminatory and retaliatory removal of Charette from the program to Benjamin's supervisor, who nevertheless supported Benjamin's actions.

39. Following Charette's charge of discrimination, Benjamin greatly reduced the frequency with which she assigned Charette as team leader in Benjamin's absence.

40. Following Charette's initial complaint of discrimination, Benjamin engaged in constant and relentless efforts to make the workplace miserable for Charette. Benjamin addressed Charette in a consistently demeaning fashion, berating and belittling Charette on a daily basis. Benjamin's continuing harassment in the workplace created substantial stress for Charette, materially affecting her physical and psychological health.

41. Following her charge of discrimination, Charette attempted on numerous occasions to transfer to other supervisors. She applied for the positions of: senior social worker on August 4, 2014; a social worker position on August 14, 2014; senior social worker on September 22, 2014; and supervisory social worker on September 22, 2014. Despite her excellent qualifications and history of successful work in the V.A., Charette was denied her requests for transfer in retaliation for her charge of discrimination

42. On June 9, 2014, July 10, 2014, and October 21, 2014, Charette's attorney requested that senior level V.A. management investigate Benjamin's actions and transfer Charette to a different supervisor. Each of the requests were ignored or rejected.

43. On August 11, 2014, Charette requested that she be placed on Family Medical Leave for a variety of stress-related medical conditions. Despite the fact that Charette's health care providers supported the existence of such conditions, Benjamin denied Charette's request for FMLA leave, claiming that the conditions did not constitute serious health conditions.

44. After Benjamin's denial of her FMLA leave request, Charette and her health care providers supplied greater detail for her FMLA leave requests in mid-August 2014. Benjamin gave

only limited approval to the extent that absences were needed for treatment of migraine headaches, but continued to deny FMLA leave for conditions including: a thyroid condition; a cardiac condition; and panic attacks.

45. On or about August 29, 2014, Charette had been hospitalized with an illness that required extended in-patient treatment. Despite her full awareness of Charette's condition, Benjamin placed Charette on Absent With Out Leave ("AWOL") status for being absent from work on that date, thereby subjecting her to disciplinary action. Benjamin further placed Charette on AWOL status for August 28, 2014, even though Charette had worked on that date; and had placed Charette on AWOL status for September 1, 2014 when the office was, in fact, closed in observance of Labor Day. When Charette notified Benjamin of these errors regarding AWOL status, Benjamin initially refused to change the designations.

46. Following her hospitalization in August and September 2014, Charette returned to work until she was scheduled for a surgical procedure at the end of September.

47. By August 10, 2014, Charette's physician had noted a distinct change in her physical and mental health, caused by significant workplace stress. Charette's physician noted that she was suffering from chronic neck pain, acute distress disorder, migraine headaches, palpitations and tachycardia, insomnia, anxiety, and possible depression.

48. In October 2014, Benjamin and Hulbert refused to sign Charette's payroll records, delaying the V.A. from paying her for moneys due.

49. By mid-October 2014, Charette's physical and mental health had continued to deteriorate, with her physician noting the same symptoms caused by workplace stress that had been noted in her September 10, 2014 letter. Charette's physician rendered the opinion that "returning

to the same hostile and stressful work environment would continue to have a negative impact on [Charette's] health, and therefore I would recommend at least a change in her immediate work environment and chain of command."

50. Based on the repeated and constant hostility and harassment, Charette realized that returning to work for Benjamin would cause her continued physical and mental suffering. On December 5, 2014, Charette's physician and her psychotherapist provided documentation to the V.A., stating that continued work under Benjamin's supervision would harm Charette. Charette therefore formally requested a reasonable accommodation of being permitted to work for another supervisor, but the V.A. has refused to respond to Charette's request.

51. To date, despite the V.A.'s substantial need for social worker services to provide treatment to a severely under-served population, the V.A. has refused to return Charette to work, and has maintained her in a Leave Without Pay Status since December 5, 2014.

**COUNT I. RACE DISCRIMINATION UNDER TITLE VII**

52. Charette restates and incorporates herein the allegations in paragraphs numbered 1 through 35, 38, and 40 through 51 above.

53. Charette was subjected to unwelcome harassment based on her race, based on the conduct described in paragraphs above.

54. Charette reasonably regarded the conduct as undesirable and offensive.

55. The conduct described above was severe, abusive, repeated, and pervaded Charette's working environment.

56. The conduct, as described above, was based upon Charette's race, in that, if she had not been Caucasian, her supervisor would not have behaved as described.

57. The conduct, as described above, affected the terms, conditions and privileges of Charette's employment by humiliating her, causing her emotional distress, and interfering with her work performance.

58. Defendant intentionally discriminated against Charette based on her race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e).

59. In discriminating against Charette, Defendant acted with malice or reckless disregard for Plaintiff's protected rights.

60. As a direct and proximate result of Defendant's violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e), Charette has suffered lost wages and benefits, emotional distress, emotional pain, suffering, stress-induced medical damages, inconvenience, mental anguish and non-pecuniary losses.

WHEREFORE, Charette respectfully requests a jury trial on all issues and relief including: compensation for all compensatory damages allowed by law; an award of reasonable attorney's fees and costs; interest; and such other additional equitable and legal relief as may be just and proper.

**COUNT II. RETALIATION UNDER TITLE VII**

61. Charette restates and incorporates herein the allegations in paragraphs numbered 1 through 51 above.

62. By filing a federal EEO informal complaint of discrimination, filing a formal complaint of discrimination, and objecting to supervisory and management employees regarding such discrimination, Charette has opposed the unlawful employment practices that Title VII of the Civil Rights Act of 1964, as defined in 42 U.S.C. § 2000e-3, prohibits.

63. By making a charge, testifying, and participating in a federal EEO discrimination and

reprisal investigation, Charette has participated in an investigation, as defined in 42 U.S.C. § 2000e-3.

64. Defendant engaged in the actions described above, which constitute adverse action for the purpose of a claim of retaliation, in that they would be deemed actions which would dissuade a reasonable worker from making or supporting a charge of discrimination.

65. As a direct and proximate result of Defendant's violation of the anti-retaliation provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e), Charette has suffered lost wages and benefits, emotional distress, emotional pain, suffering, inconvenience, mental anguish and non-pecuniary losses.

WHEREFORE, Charette respectfully requests a jury trial on all issues and relief including: compensation for all compensatory damages allowed by law; an award of reasonable attorney's fees and costs; interest; and such other additional equitable and legal relief as may be just and proper.

**DEMAND FOR JURY TRIAL**

66. Plaintiff hereby demands a trial by jury on all issues so triable in this action.

Respectfully submitted on this 22nd day of May, 2015.

DELEGAL LAW OFFICES, P.A.

/s/ Tad Delegal
T. A. "Tad" Delegal III
Fla. Bar No.: 0892701
424 East Monroe Street
Jacksonville, FL 32202
Phone: (904) 633-5000
Fax: (904) 358-2850
Email: tad@delegal.net
Secondary: office@delegal.net

Attorney for Plaintiff.